STATE of South Dakota, Plaintiff and Respondent,

v.

Mark ROTH, Defendant and Appellant.

No. 12236.

Supreme Court of South Dakota.

Sept. 13, 1978.

Marc Weber Tobias, Asst. Atty. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on brief.

Sidney B. Strange, Sioux Falls, for defendant and appellant.

WOLLMAN, Chief Justice.

Appellant was charged with possession of amphetamines with intent to distribute and possession of marijuana with intent to distribute. He was found guilty on both charges following a trial to the court, and he appeals from the judgment of conviction. We affirm.

On July 22, 1976, Michael Powers, a resident of Kimball, South Dakota, accompanied by Roger Steffans who, unknown to Powers, was working as an undercover agent for the Division of Criminal Investigation, journeyed to Vermillion, South Dakota, for the purpose of making a drug transaction.

On the evening of that same day, Donald Gromer, a special agent with the Division of Criminal Investigation, met with Herb Hollingsworth, an employee of the drug enforcement unit of the Division of Criminal Investigation, for the purpose of carrying out surveillance of a possible drug transaction in Vermillion. Early that evening Powers and one Lindsay Bergdale were arrested as a result of an apparent drug transaction between them. At approximately 8:00 p. m. that evening Powers retained Mark Meierhenry, a Vermillion attorney, to represent him. As a result of conversations between Mr. Meierhenry and Marc Tobias, an Assistant Attorney General who was in Vermillion to assist the local law officers in connection with their surveillance, an agreement was reached whereby charges against Powers would be dismissed in return for his cooperation in giving certain information regarding the circumstances that had led to his arrest and his willingness to testify against appellant. Apparently as a result of this agreement, an affidavit for Powers' signature was prepared by Mr. Tobias in Mr. Meierhenry's office late that night. At approximately 4:00 a. m. on July 23, 1976, agent Gromer, Mr. Tobias, and Powers appeared at the home of Judge Robert C. Ulrich, who was then serving as law-trained magistrate in the First Judicial Circuit. Agent Gromer and Powers were placed under oath by Judge Ulrich, and each signed an affidavit in support of a search warrant.* A warrant was duly issued, and at approximately 6:45 that morning agent Gromer executed the warrant by searching the residence occupied by appellant in Union County, South Dakota. In response to agent Gromer's question whether appellant was in possession of any controlled substance, appellant replied that what the officers were looking for was upstairs. He led the officers to a bedroom area, pointed to a suitcase and said, "It is in there." The suitcase was determined to contain approximately 25,000 white tablets, approximately 200 of which, selected as a representative sample, were later determined to contain amphetamine. Agent Gromer found several small bags containing marijuana under a couch in the living room. A larger quantity of marijuana in a loose, unpackaged condition was found in a paper sack inside a closet on the first floor. Altogether, the marijuana weighed approximately 40.95 ounces.

In addition to the controlled substances found in appellant's residence, a triple beam scale covered by a plastic dust cover was found in a dresser drawer on the second floor of the premises.

* See Appendix.

Appellant attacks the sufficiency of the affidavits upon which the search warrant was issued. He contends that the affidavits satisfy neither of the two prongs of the test governing the sufficiency of affidavits for search warrants established by the United States Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637.

The state concedes that standing alone, Powers' affidavit does not establish probable cause. The state argues, however, and we agree, that when the two affidavits are read together, they contain sufficient information from which the magistrate could determine that probable cause existed to believe that appellant was in possession of amphetamines at his residence on the date the affidavits were executed.

The *Aguilar* test requires a showing of the underlying circumstances from which it can be determined that the informant knows whereof he speaks and a showing that the informant is a person who can be believed. As the Wisconsin Supreme Court has stated, "Both prongs of the *Aguilar* test stated above go to the informant's reliability; the first to his informational reliability or credibility, and the second to his observational reliability." *Rainey v. State,* 74 Wis.2d 189, 197, 246 N.W.2d 529, 532.

■ We conclude that the two affidavits satisfy both prongs of the *Aguilar* test. First, we note that both *Aguilar* and *Spinelli* involved unnamed informants. As we held in *State v. Haron,* 88 S.D. 397, 220 N.W.2d 829, and *State v. Gerber,* S.D., 241 N.W.2d 720, a less exacting test of informant reliability is applied in those cases in which the informant is an identified citizen eyewitness or victim of an offense and not a paid police informant. See also *State v. Kissner,* S.D., 252 N.W.2d 330. Although strictly speaking Powers did not fall within either of those two categories inasmuch as he was an alleged participant in an immediately preceding drug violation, neither was he an anonymous paid informant. Rather than having his information presented to the magistrate in hearsay form through a

police officer's affidavit, Powers executed the affidavit under oath in the magistrate's presence. He was therefore not some disembodied wraith, arising in the magistrate's visualization only from the words of the affidavit, but was physically present to swear to the facts set forth in the affidavit. Granted that the record does not establish that the magistrate personally questioned Powers or otherwise tested his credibility, yet the fact remains that Powers was more than the usual faceless, nameless police informant the fact of whose very existence depends upon the credibility of the police officer's affidavit and whose credibility and informational reliability can be established only through the circumstances detailed in · the officer's affidavit. As the Wisconsin Supreme Court held in the *Rainey* case, supra, where one who is not a paid police informer appears before the magistrate personally and swears to the facts establishing probable cause for the issuance of a search warrant, the *Aguilar* tests are not applicable even if the informant's name is not disclosed out of respect for his fear of possible retaliation by the subject of the search. Although the *Rainey* case is not fully applicable here inasmuch as the record does not indicate that the magistrate personally questioned Powers under oath, we believe that the rationale of that case is applicable to the instant case. Judge Ulrich had before him one who had recently been apprehended in an apparent drug violation, who was willing to be fully identified as a source of information concerning appellant's drug transactions, and who was willing to swear to the truth of the information that he was able to give concerning appellant.

Moreover, Powers' statements were against his penal interests. Granted that the state had apparently agreed not to prosecute him as a result of his participation in the events of the evening of July 22, the fact remains that Powers admitted to facts that placed him in a highly unfavorable light in the eyes of the law and in terms of conventional morality. The fact that he was promised immunity does not erase the

indicia of credibility that attached to his declarations against his interests. We conclude that what was said in *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723, is applicable here:

Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search. That the informant may be paid or promised a "break" does not eliminate the residual risk and opprobrium of having admitted criminal conduct. 403 U.S. at 583, 91 S.Ct. at 2082, 29 L.Ed.2d at 734 (plurality opinion).

See also *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242.

■ We turn, then, to the question whether the information contained in Powers' affidavit was so stale as not to justify a determination that there was probable cause to believe that amphetamines would be found at appellant's residence. Appellant challenges Powers' affidavit on the ground that it did not set forth any circumstances from which the magistrate could determine whether the alleged criminal activity continued to the time that the search warrant was issued. Appellant argues that because the affidavit reveals that Powers had never spoken directly with appellant, had never been to appellant's residence, had never been told by Lindsay Bergdale that Bergdale would be getting pills from appellant on the night in question, and had had no contact with appellant during the month prior to the date of the affidavit, the information set forth in the affidavit was too stale to justify a determination of probable cause that appellant was in possession of amphetamines on the night in question.

The Court of Appeals for the Eighth Circuit stated the basic rule of probable cause in *United States v. Steeves*, 525 F.2d 33, 37:

It is axiomatic by now that under the fourth amendment the probable cause upon which a valid search warrant must be based must exist at the time at which the warrant is issued, not at some earlier time. That was recognized more than forty years ago in the leading case of

*Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932).

See also 3 Wright, Federal Practice and Procedure § 662.

In *State v. Haron, supra*, we held that a fair, commonsense reading of the affidavit there in question indicated a course of conduct on the part of the individual in question sufficient to establish that his association with the premises was sufficiently continuing to justify the magistrate's conclusion that there was a reasonable probability that the property to be searched for would be found on the premises. We conclude that a fair reading of the affidavits in the instant case leads to a similar result here.

The likelihood that criminal activity is of a continuing nature rather than singular in occurrence depends upon the facts and circumstances of each case. We think that a fair, commonsense reading of the two affidavits presented sufficient evidence from which the magistrate could conclude that appellant was engaged in an ongoing series of drug transactions. Powers' affidavit revealed that he had been told that appellant was a source from which he could purchase amphetamines; indeed, Powers was given appellant's telephone number, the authenticity of which was verified by agent Gromer. At the time of the transaction in Vermillion on June 22, Powers was told by Lindsay Bergdale that he, Bergdale, would have to drive for approximately one-half hour to a farm to get the remainder of the amphetamines and that Bergdale would deliver the remainder of the drugs to Powers and his companion at Beresford, South Dakota, the location of which the magistrate could take judicial notice is north and east of Vermillion. Agent Gromer's affidavit established that he followed Lindsay Bergdale east out of Vermillion on Highway 50 shortly after the transaction between Bergdale and Powers and that at the time of his arrest Bergdale had on his person $5,000, the exact amount that he had been paid by Powers a few minutes earlier. True, approximately one month had passed since Powers had had any contact with Bergdale or appellant, but giv-

en the totality of the circumstances that fact did not preclude a determination that probable cause existed on the date the affidavits were signed. We conclude that what the Court of Appeals of Maryland stated in *Peterson v. State*, 281 Md. 309, 379 A.2d 164, is applicable to the instant case:

> In other words, the facts were such that a reasonably discreet and prudent man would be led to believe that the apartment contained unlawful drugs. By its nature, traffic in illegal drugs is ordinarily a regenerating activity, and there was clear indication here that the activity was continual, a course of conduct regularly followed over a protracted time. . .
>
> It is true that narcotics are easily transferable, but the repeated distributions evident from the facts showed that they were readily replaceable and that Peterson had an available source of supply. 281 Md. at 321, 379 A.2d at 170.

As the Court of Appeals for the Tenth Circuit stated in *United States v. Johnson*, 461 F.2d 285:

> Initially, it should be noted that the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. Together with the element of time we must consider the nature of the unlawful activity. Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant. 461 F.2d at 287.

In a similar vein, the Court of Appeals for the Eighth Circuit stated in the *Steeves* case, *supra*:

> While the lapse of time involved is an important consideration and may in some cases be controlling, it is not necessarily so. There are other factors to be considered, including the nature of the criminal activity involved, and the kind of property for which authority to search is sought. 525 F.2d at 38.

See also *Andresen v. Maryland*, 427 U.S. 463, 478, 96 S.Ct. 2737, 2747, 49 L.Ed.2d 627, 641 n. 9.

In summary, then, we conclude that the magistrate properly found that there was probable cause to believe that the amphetamines would be found at appellant's residence on the morning of July 23, 1976.

■ Appellant contends that because the state developed no factual basis to indicate appellant's actual intent to possess the marijuana with intent to distribute, the trial court erred in failing to dismiss that count of the information. It is true that the greater portion of the 40.95 ounces of marijuana was found in a loose condition inside a paper sack. To that extent, the evidence against appellant was not as compelling as that against the defendant in *State v. Jahnz*, S.D., 261 N.W.2d 426, where we noted that in addition to the quantity of the marijuana there involved there was evidence of packaging for resale and the actual observation of a transfer of one of the bags of marijuana. Although only a small portion of the marijuana found in appellant's residence was in a prepackaged form, we conclude that when viewed against the totality of circumstances surrounding appellant's possession of the large quantity of amphetamine pills, together with the discovery of the scale, the trier of fact could reasonably find that appellant possessed the marijuana with the intent to distribute it.

■ Appellant contends that the trial court erred in denying his motion for separate trials on the two offenses charged in the information. SDCL 23-32-8 provides:

> The court in the interest of justice and for good cause shown may, in its discretion, order that the different offenses or counts set forth in the indictment or information be tried separately, or divided into two or more groups and each of said groups tried separately.

As we said in *State v. Van Beek*, 88 S.D. 154, 157, 216 N.W.2d 561, 563:

The denial of separate trials is not cause for reversal unless the court in so ruling abused its discretion. Wise judicial discretion should be exercised by the courts in this regard to protect the accused from prejudice.

We conclude that the trial court did not abuse its discretion in refusing to order separate trials on the two counts. The trial court quite properly expressed its concern about the fact that to grant the motion for separate trials would simply be to duplicate the trial for two different counts when the evidence on both counts would be the same. Appellant argues that because he would have subjected himself to cross examination concerning the amphetamines had he taken the stand to testify concerning his possession of the marijuana, he was forced to choose between waiving his right to jury trial and taking the stand on his own behalf. The state responds by contending that if appellant had elected to testify, his direct testimony could have been limited to the marijuana charge only, with no cross examination by the state regarding the amphetamines. We need not determine whether the state would have been restricted in its cross examination of appellant, for appellant chose not to testify even after waiving his right to jury trial. We conclude, therefore, that appellant has demonstrated no real prejudice as a result of the denial of his motion for severance.

■ Finally, defendant argues that the court erred by admitting into evidence the beam scale found in the search. Appellant argues that because the scale was found in a dresser drawer and because the state introduced no evidence to indicate that it had been used in weighing and packaging drugs, the scale was irrelevant and immaterial to the issues raised at trial. We conclude that the trial court did not err in admitting the scale into evidence. It appears that the scale was of a type that would be suitable for weighing relatively small quantities of substances such as the marijuana and amphetamine pills found in appellant's residence. Given that fact, it was for the trial court to determine the probative value the presence of the scale in appellant's bedroom had with respect to the question of appellant's intent to distribute the drugs in question.

The judgment of conviction is affirmed.

DUNN and PORTER, JJ., concur.

ZASTROW and MORGAN, JJ., concur specially.

MORGAN, Justice (concurring specially).

I concur in the opinion that the two prongs of the *Aguilar* test were met by reading both affidavits. I therefore see no reason to weaken the requirements of that test. In this case I really see no difference between a paid informant for cash and an informant who receives favors.

I will grant that the absence of hearsay in an officer's affidavit diminishes the necessity of showing that the informant was reliable in the past; nevertheless, the informant's affidavit should still show both informational reliability and credibility and observational reliability. A crank can sign an affidavit as can an embittered enemy. A citizen can make an accusation in an area where he has total lack of knowledge; witness the recent case where the informant was informing on the use of drugs that turned out to be sand and vitamin pills. I think that the majority paint with too broad a brush.

I am authorized to state that Justice ZASTROW joins in this special concurrence.

### APPENDIX

Agent Gromer's affidavit was as follows:

1. That my name is Donald Gromer, and that I am a Special Agent for the South Dakota Division of Criminal Investigation, and that as such I am charged with investigating violations of the laws of the State of South Dakota, and that I have been so employed at all times pertinent hereto;

2. That during the late afternoon and evening hours of 22 July, 1976, I conducted a surveillance involving one Michael

Powers, and one other individual, in the Vermillion, South Dakota area;

3. That I observed the subjects vehicle arrive in the area of the Sommerset apartments at approximately 7:30 PM on 22 July, 1976, and that a short time thereafter I observed a tan Volkswagen, license South Dakota 1976 CL4530, arrive at the apartments; that a few minutes after this vehicle arrived, with one male occupant, the driver who had entered the apartment upon arriving, left the apartment, and headed east on highway 50; that at this time I stopped this subject, placed him under arrest, and ascertained that he was Lindsay Bergdale, and that I took from his person approximately $5000 in 100 dollar bills;

4. That approximately two hours later, the apartment, number 14, at the Sunset [sic] apartments was searched by other state agents, and I was advised that two plastic bags, containing a large quantity of amphetamine tablets were recovered from the apartment;

5. That affiant contacted the sheriff in Chamberlain, and had the sheriff go to the apartment of Michael Powers in Oacoma and attempt to locate an envelope with a telephone number written on it, addressed to Powers, and from Gail Herman, that the sheriff called me back by telephone some 45 minutes later and advised that he did find such an envelope, and that a telephone number of 934–1985 was printed on the front of the envelope;

6. That said telephone number lists to one MARK ROTH of Alcester, South Dakota, a rural residence;

7. That upon further checking, I have ascertained that this is a farm located approximately 30 minutes driving time from Vermillion, and that I believe that the said Mark Roth is also known by the name of Animal;

8. That the residence to which the telephone number 934–1985 lists is located in section 5, township 94, range 49 Big Springs Township Union County, and further that the residence is located directly to the west of the Frank Farley residence, and to the east of the L. E. Wilson residence; and further that the residence is two miles south on highway 11 and one and three quarters west, on the north side of the road; from Alcester;

9. That I checked with Jim Navis, Agent, Iowa Bureau of Narcotics, Sioux City, by telephone during the late evening hours of July 22, and he advised after checking with other law enforcement officers in Iowa that Mark Roth was known as ANIMAL;

10. That the above described residence is approximately one half hour drive from Vermillion

WHEREFORE, your affiant has probable cause to believe and does believe that the above described residence, and any attached buildings thereon contains a quantity believed to be approximately 50,000 to 70,000 amphetamine tablets, which are a controlled substance pursuant to SDCL 39–17, and asks that a Warrant of Search issue for the above described residence, and directing that if such property or evidence or any part thereof be found that it be seized and brought before the court together with such other and further relief that the court may deem proper.

Powers' affidavit reads as follows:

1. That My name is Michael Powers, that I am 22 years of age, and that I reside in Oacoma, South Dakota;

2. That approximately one month ago, I contacted one Lindsay Bergdale, a resident of Clay County, South Dakota, with respect to the purchase of a quantity of approximately 25,000 tablets of amphetamines, and that at the time I contacted Bergdale by telephone, he indicated to me that he thought he might know of someone who might have available such a quantity of amphetamines;

3. That approximately two days after the above noted telephone conversation with Lindsay Bergdale, I was in Vermillion and met with Lindsay Bergdale, and an individual who was introduced to me as ANIMAL, said person supposedly lived on a farm near Haywarden, Iowa;

4. That during this meeting in Vermillion, I was also given the telephone number of Animal by Lindsay Bergdale, and advised that if Bergdale was out of town, that I could contact Animal directly by telephone to purchase amphetamines;

5. That the telephone number given to me I wrote on an envelope addressed to me, with a return address from one Gail Herman, with an APO address, and maintained such envelope at my apartment;

6. That on Tuesday, July 20, 1976, I called Lindsay Bergdale in Vermillion to see what was happening regarding my request to purchase the above described quantity of amphetamines; that at this time, Lindsay Bergdale indicated to me that he thought a quantity of between 50,000 and 75,000 tablets of amphetamines would be available;

7. That on Wednesday evening, July 21, 1976, Bergdale called your affiant at approximately 12:30 AM (early Thursday Morning) and advised that the amphetamines would be available on Thursday, July 22, 1976, and to be in Vermillion at 6:30 PM, and that about 50,000 tablets could be purchased;

8. That at approximately 7:45 PM on Wednesday, July 22, 1976, I arrived at the Sunset [sic] Apartments in Vermillion with one other individual to purchase the above described amphetamines; that a short time after my arrival, Lindsay Bergdale arrived and delivered two plastic bags containing 5,000 (approximately) tablets of amphetamines, and indicated that he had to go get the remaining amount, which I believed to be approximately 25,000 tablets; Lindsay Bergdale was paid $5,000 for the entire transaction, and took all of the money before leaving the apartment;

9. Bergdale indicated to me that he would have to drive for approximately one half hour to a farm to get the rest of the amphetamines. He indicated to me that he would call when he got the drugs, and meet us at the Trucktown reststop at Beersford [sic] to make the rest of the delivery;

10. That it is my belief that Lindsay Bergdale was going to the farm of an individual known as ANIMAL to make the purchase of the amphetamines;

11. That a short time after Bergdale left the apartment on 22 July, 1976, I and one other male individual were arrested by state agents.

12. That my part in the above described transaction was to arrange for the individual who was with me to make the purchase from Lindsay Bergdale.