STATE of South Dakota, Plaintiff
and Appellee,

v.

Nels IVERSON, Defendant
and Appellant.

No. 14402.

Supreme Court of South Dakota.

Argued Sept. 10, 1984.

Decided Feb. 27, 1985.

Richard Dale, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Karen E. Bjerke of Hagen & Wilka, Sioux Falls, for defendant and appellant.

MORGAN, Justice.

Defendant, Nels Iverson (Iverson), was charged with the unauthorized distribution of marijuana, possession of more than one pound of marijuana, and possession of a controlled substance, cocaine. A jury convicted Iverson on the charges of distribution of marijuana and possession of more than one pound of marijuana and acquitted him on the charge of possession of a controlled substance. Iverson appeals from these convictions. We affirm.

Sometime between April 1 and April 9, 1983, a Hughes County Deputy Sheriff asked Robert Hammer (Hammer) to consider working as a police informant in drug investigations. Hammer initially declined. On April 9 or 10, Hammer reconsidered and informed the deputy that he would purchase drugs for law enforcement authorities. The Hughes County Sheriff's Office was not handling drug enforcement investigations at that time and the deputy introduced Hammer to Tom Disburg (Disburg), a Division of Criminal Investigation (DCI) Agent. On April 15, Hammer told Disburg and the deputy that he could purchase marijuana from Iverson. While in Iverson's presence on Friday, April 15, Hammer observed Iverson's roommate toss a small bag of marijuana to a named individual who was standing beneath her apartment window. Hammer arranged to meet with

and purchase marijuana from Iverson after 3:00 p.m. on the same day. Hammer then arranged an appointment with Disburg. A Pierre Police Detective accompanied Disburg and the two met with Hammer in a parking lot at approximately 2:30 p.m. that afternoon. The purpose of the meeting was to arrange a "controlled buy" and thereby enable law enforcement personnel to monitor the drug transaction. Hammer and his automobile were searched for drugs and a tape recorder with a microphone was hidden in Hammer's clothing. Disburg and the detective then followed Hammer and kept his car in sight all the way to the apartment building in which Iverson lived. They parked down the street and watched Hammer enter the building.

Iverson's roommate, who testified and corroborated Hammer's testimony regarding the transaction, was present during the "controlled buy." Her son and Iverson's mother were also present. Hammer purchased two ounces of marijuana from Iverson at $40.00 per ounce and paid with money Disburg had given him. Iverson procured the marijuana from a paper sack in a closet. Hammer observed more than a pound of marijuana while in the apartment.

Disburg and the police detective watched Hammer leave the apartment building and followed him back to the parking lot. They again maintained visual contact with Hammer's vehicle. Upon their return to the parking lot, Disburg took the marijuana and the tape recorder from Hammer and sent the marijuana to the State Chemical Laboratory for analysis and weighing.

Based on Hammer's observations and the fruits and recording of this transaction, Disburg requested a warrant to search Iverson's apartment. Disburg's affidavit did not identify Hammer as the informant and Hammer did not appear before the magistrate.[1] The warrant was issued on Monday, April 18, 1983, and executed by Disburg, the detective, and two deputies, on Tuesday, April 19, four days after the Friday transaction. When the law enforce-

---

1. The warrant affidavit is appended at the end of this opinion.

ment personnel arrived at the apartment, there was no one present to answer the door. Disburg obtained a key from the apartment complex manager and the officers searched the apartment. A quantity of marijuana, a scale and four amber vials were found and sent to the State Chemical Laboratory for analysis. A jury found Iverson guilty of distribution of marijuana and possession of more than one pound of marijuana.

Iverson raises six issues on this appeal: (1) whether the affidavit in support of the search warrant made an adequate showing of probable cause; (2) whether the tape recording of the drug transaction should have been suppressed for lack of prior authorization for the interception of oral communications, pursuant to SDCL ch. 23A–35A; (3) whether the trial court denied Iverson a fair trial when it stated to the jury, "I believe the tape recording was made on 4–15 of '83 and an attempt was made to purchase two ounces of marijuana from Nels Iverson"; (4) whether the search warrant was unlawfully executed in violation of the knock and announce statute; (5) whether Iverson was entrapped and therefore entitled to an acquittal; and (6) whether Iverson was denied his constitutional rights and due process of law as a result of ineffective assistance of counsel at trial.

Iverson first contends that Disburg's affidavit in support of his request for a search warrant was insufficient to justify the magistrate's determination that there was probable cause to believe that Iverson possessed marijuana at his residence on the date the search warrant was issued. His contention is based on two United States Supreme Court decisions, *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).[2] Under *Aguilar*, the affidavit must set out a basis for the affiant's conclusion that an informant was "credible" or that

his information was reliable. 378 U.S. at 114, 84 S.Ct. at 1514, 12 L.Ed.2d at 729. The magistrate must "judge for himself the persuasiveness of the facts relied on ... to show probable cause." *Id.* He may not accept the informant's suspicion, belief or mere conclusion without question. *Id.*

> [T]he magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was "credible" or his information "reliable." Otherwise, "the inferences from the facts which lead to the complaint" will be drawn not "by a neutral and detached magistrate," as the Constitution requires, but instead, by a police officer "engaged in the often competitive enterprise of ferreting out crime," or, as in this case, by an unidentified informant. (citations omitted)

378 U.S. at 114–15, 84 S.Ct. at 1514, 12 L.Ed.2d at 729.

In *Spinelli, supra,* the United States Supreme Court built on *Aguilar* and developed and applied the *Aguilar-Spinelli* test to determine the adequacy of affidavits containing reports from anonymous informants and independent corroboration. The *Spinelli* Court pointed out that the informant's tip was a fundamental part of the affidavit in that it provided the only connection between innocent-seeming activity and the assertion of suspicion. 393 U.S. at 414–15, 89 S.Ct. at 588, 21 L.Ed.2d at 642–43. Because of the importance of this connection in the magistrate's decision to issue the search warrant, the *Spinelli* Court held that the first step in the *Aguilar* analysis must be an assessment of the probative value of the informant's report under the *Aguilar* standards. 393 U.S. at 415, 89 S.Ct. at 588, 21 L.Ed.2d at 643.

**2.** The United States Supreme Court overruled *Aguilar* and *Spinelli* in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), approximately two months after the search warrant was issued in this case. The search warrant in this case was properly issued under the *Aguilar-Spinelli* standard and a determination of whether *Gates* should be applied retroactively is unnecessary.

In the event the tip is found inadequate under *Aguilar* because the magistrate was not shown sufficient underlying circumstances to support the informant's conclusion, or sufficient underlying circumstances to support the affiant's faith in the informant's credibility or reliability, the magistrate should then consider allegations based upon independent investigation which corroborate the hearsay information. *Id.* The *Aguilar* standards must also be applied in the second step of the analysis. There the magistrate must ask whether the tip, when certain parts are corroborated by independent sources, is as trustworthy as a tip which would pass the *Aguilar* tests without independent corroboration. *Id.*

The *Aguilar* tests are relevant to implement the long-standing principle that probable cause must be determined by a "neutral and detached magistrate." "A magistrate cannot be said to have properly discharged his constitutional duty if he relies on an informer's tip which—even when partially corroborated—is not as reliable as one which passes *Aguilar's* requirements when standing alone." *Spinelli,* 393 U.S. at 415–16, 89 S.Ct. at 589, 21 L.Ed.2d at 643.

We read this to mean that the magistrate may not simply rely on the fact that there is *some* independent corroboration; rather, he must determine whether the informant's tip, as corroborated, meets the *Aguilar* standard of validity and credibility or reliability.

The United States Supreme Court noted when it adopted the rather stringent *Aguilar-Spinelli* test that they were not retreating from the established propositions that: (1) only the probability, and not a prima facie showing of criminal activity is the standard of probable cause, (2) probable cause affidavits are tested by less rigorous standards than those governing the admissibility of evidence at trial, (3) magistrates are not confined to narrow limitations or restrictions on the use of their common sense in the determination of probable cause, and finally (4) a magistrate's determination of probable cause should be

paid great deference by reviewing courts. *Spinelli,* 393 U.S. at 419, 89 S.Ct. at 590–91, 21 L.Ed.2d at 645.

This court's determination of whether an affidavit in support of a search warrant shows probable cause for issuance of the warrant must be based upon an examination of the four corners of the affidavit. *State v. Smith,* 281 N.W.2d 430 (S.D.1979). Probable cause in relation to search warrants is defined as " 'the existence of facts and circumstances as would warrant an honest belief in the mind of a reasonable, prudent man acting on all the facts and circumstances within the knowledge of the magistrate ... that the property sought exists at the place designated.' [citation omitted]." *Id.* at 435. This court's standard of review is set out in *State v. Kaseman,* 273 N.W.2d 716, 722 (S.D.1978): "In reviewing the affidavits, we should not invalidate the search warrants by interpreting the affidavits in a hypertechnical manner; rather, we should read each affidavit as a whole and interpret each in a common-sense and realistic manner." *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *State v. Wellner,* 318 N.W.2d 324 (S.D.1982); *State v. Gerber,* 90 S.D. 432, 241 N.W.2d 720 (1976); *State v. Haron,* 88 S.D. 397, 220 N.W.2d 829 (1974). It is often difficult to determine whether an affidavit demonstrates the existence of probable cause, and the resolution of these marginal cases should be largely determined by the preference to be accorded to warrants. *State v. Kietzke,* 85 S.D. 502, 186 N.W.2d 551 (1971). Every reasonable inference possible should be drawn in order to support the determination of probable cause by the magistrate. *State v. Glidden,* 246 N.W.2d 779 (S.D.1976). *See also Spinelli, supra.*

In *State v. Nollsch,* 273 N.W.2d 732 (S.D. 1978), this court set its standard for the issuance of search warrants when the informant relied upon in the affidavit is not identified nor before the magistrate. We cited *Aguilar* and *Spinelli* and held that when informants are not identified nor be-

fore the magistrate, the magistrate must be informed of some of the underlying facts and circumstances from which the informant concluded that contraband was where he said it was, and of some of the underlying facts and circumstances from which the police concluded that the informant was credible. *Id.* The informant in this case was neither named in the affidavit nor before the magistrate. He was also not a citizen informant or a victim and therefore does not meet the requirements this court set out in *State v. Gerber, supra,* and *State v. Haron, supra.*

In *Nollsch, supra,* a trial court's suppression of the fruits of a search was affirmed because the only underlying fact or circumstance revealed in the affidavit from which the magistrate could have concluded that contraband was in the searched vehicle was the informant's statement that he saw what appeared to be contraband in the car. The *Nollsch* Court stated that personal observation satisfied the first prong of the *Aguilar-Spinelli* test, but the second prong required that the informant disclose underlying facts and circumstances to show his or her reliability or credibility. Alternatively, we held that the second prong of *Aguilar-Spinelli* may be satisfied when the affidavit shows that the police have independently verified the details of the informant's story.

▊ It is clear that in this case Hammer's statement, over the phone, that "he had set up a deal with Nels Iverson to purchase marijuana at 3 P.M." would not have been sufficient support for issuance of a warrant. An affidavit based on this statement would not pass a single portion of the *Aguilar* standards. Disburg's affidavit in support of request for search warrant goes much further, however.

In his affidavit, Disburg explained that his investigation began with a tip from a confidential informant. Disburg did not name Hammer nor assert that he was credible or reliable. The affidavit merely states that: "Your affiant was contacted on the morning of April 15, 1983 by a confidential informant who advised he had

set up a deal with NELS IVERSON to purchase marijuana at 3 PM." The one and one-half pages of the affidavit that follow set out the "underlying circumstances" from which Hammer concluded that there was marijuana in Iverson's apartment and from which Disburg concluded that Hammer was credible and that his information was reliable. This portion of the affidavit describes the "controlled buy" that comprised Disburg's independent investigation. Hammer was searched and followed to and from the "controlled buy" site in order to preclude the possibility that he was setting Iverson up. When Hammer returned from the "controlled buy," he reported to Disburg that

he had purchased ... 2 ounces of marijuana from NELS IVERSON in apartment 206 for $80.00. Confidential informant further stated NELS IVERSON had stated he had 1¾ pounds of marijuana in the bedroom which he showed the confidential informant.

As part of the "underlying circumstances" to support both his faith in Hammer's credibility and to demonstrate that Hammer had a basis for his conclusion that Iverson had marijuana in his apartment, Disburg stated in his affidavit that Hammer had turned over to him a paper sack containing a plastic bag of marijuana, a tape recorder, and a tape of the transaction. Disburg further stated that he had listened to the tape and that the tape verified Hammer's reports regarding his purchase of the marijuana and the presence of one and three-quarter pounds of marijuana in Iverson's apartment.

The "controlled buy" and the marijuana and tape recording turned over to Disburg are sufficient underlying circumstances to support Disburg's conclusion that Iverson had an illegal amount of marijuana in his apartment and that Hammer was a reliable informant. The affidavit set out the manner in which the information was acquired and the alleged criminal activity in sufficient detail to demonstrate to the magistrate that Disburg was relying on something more substantial than a casual rumor

or an accusation based on an individual's general reputation. *See Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589, 21 L.Ed.2d at 644. The magistrate could reasonably have inferred from the affidavit that Hammer obtained his information in a reliable manner and that issuance of a search warrant was justified. The allegations in Disburg's affidavit demonstrate more than a possibility that Iverson was violating the law. By the time the "controlled buy" and Disburg's independent investigation were completed, the evidence gathered clearly showed that Hammer's information was reliable and that probable cause for the next step in the investigation, a search of the apartment, was established under the *Aguilar-Spinelli* standards.

Iverson also questions whether Disburg's affidavit set out sufficient circumstances to warrant a determination that the alleged criminal activity continued to the time the search warrant was issued. The "controlled buy" and Disburg's investigation took place on April 15 and the warrant was requested on April 18.

The Court of Appeals for the Eighth Circuit stated in *United States v. Steeves,* 525 F.2d 33, 37 (8th Cir.1975) that "under the fourth amendment the probable cause upon which a valid search warrant must be based must exist at the time at which the warrant is issued, not at some earlier time." The likelihood that criminal activity is continuous depends upon the facts and circumstances of each case. *State v. Roth,* 269 N.W.2d 808 (S.D.1978). A fair commonsense reading of Disburg's affidavit warranted the magistrate's conclusion that Iverson had more than one pound of marijuana in his possession. The affidavit read:

> Confidential informant further stated NELS IVERSON had stated he had 1¾ pounds of marijuana in the bedroom which he showed the confidential informant. Your affiant received the tape recorder and tape from the confidential informant and has listened to this tape recording. This tape recording verified the confidential informant's information as to the purchase of the marijuana and the statement about the 1¾ pounds of marijuana in the bedroom.

The magistrate could have reasonably assumed that Iverson would not have used, sold or otherwise disposed of one and three-quarter pounds of marijuana in four days' time and that at least a portion of it would still be in the apartment. In *Roth, supra,* there was no contact between the informant and the defendant for approximately one month before the warrant was issued. We held that given the totality of the circumstances that fact did not preclude a determination that probable cause existed at the time the affidavits were signed.

In this case, the passage of four days between the date Hammer saw the one and three-quarter pounds of marijuana and the date the affidavits were signed did not preclude the magistrate's determination that there was marijuana in Iverson's apartment and that probable cause existed on the date the warrant was issued. The *Roth* opinion quoted *United States v. Johnson,* 461 F.2d 285 (10th Cir.1972), for the proposition that "the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit." 461 F.2d at 287. Other factors must be considered, including the nature of the criminal activity involved and the kind of property sought. *Steeves,* 525 F.2d at 38. The magistrate properly found probable cause to believe Iverson had marijuana in his apartment on April 18, 1983.

■ Iverson's second contention on this appeal is that the tape recording of the "controlled buy" should have been suppressed for lack of prior authorization. Iverson's argument is based on his belief that the recording falls under the warrant authorization requirements of SDCL ch. 23A–35A. SDCL ch. 23A–35A requires the attorney general and state's attorneys to apply and show probable cause to a circuit judge for authorization or approval to intercept oral communications. SDCL 23A–35A–3, –4, –5, and –6. That Code chapter

deals with the interception of "oral communications," defined therein as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception *under circumstances justifying such expectation* [.]" (Emphasis added.) SDCL 23A–35A–1(2).

Disburg's failure to obtain prior authorization under SDCL ch. 23A–35A is not determinative in this case. Only the interception of an "oral communication" triggers application of this Code chapter. Absent an "oral communication," the procedural requirements of SDCL ch. 23A–35A do not apply. The conversation and drug transaction Hammer recorded do not fit the statutory definition of an oral communication. It is clear under the statutory definition of oral communication that a person's expectation that a communication will not be intercepted must be justified in order to trigger the constraints and protections of SDCL ch. 23A–35A. *See* SDCL 23A–35A–1(2).

While Iverson does not contend that Hammer's tape recording of their conversation violated his Fourth Amendment rights, the cases cited below on that issue are relevant and useful in determining the parameters of Iverson's justifiable expectation that the conversation was exclusive. In *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), *reh. granted on other grounds,* 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967), the United States Supreme Court held that a defendant's expectation that a person with whom he converses will not reveal the conversation to the police is unjustified and not protected by the Constitution. Likewise, when a defendant has confided in an apparent colleague, who turns out to be a law enforcement agent, his expectation that the conversation will remain exclusive is not protected by the Fourth Amendment. *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), *reh. denied,* 402 U.S. 990, 91 S.Ct. 1643, 29 L.Ed.2d 156 (1971). No warrant to "search and seize" is required when the Government sends an undercover agent to a defendant's home to purchase narcotics from the accused, *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), *reh. denied,* 386 U.S. 939, 87 S.Ct. 951, 17 L.Ed.2d 811 (1967), or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the recording is later offered in evidence. *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), *reh. denied,* 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (1963).

In *White, supra,* the United States Supreme Court found no difference between an undercover police agent who, without a warrant, writes down his conversations with a defendant and testifies regarding the conversations, and a police agent who simultaneously records conversations with electronic equipment. *See Lopez, supra. White, supra,* deals with the limits of a defendant's justifiable expectation that his conversations are exclusive, or more precisely, what expectations the Fourth Amendment protects in the absence of a warrant. It is clear from the case law cited that Iverson had no justifiable expectation that his communications would not be intercepted. The trial court correctly refused to suppress the tape recording.

Iverson's third contention on this appeal is that a remark by the trial judge, "I believe the tape recording was made on 4–15 of '83 and an attempt was made to purchase two ounces of marijuana from Nels Iverson," denied him a fair trial. We note first that the trial court did not say that Iverson sold any marijuana; the statement does not indicate the trial judge's belief in Iverson's guilt or his innocence. We note further that Iverson's counsel[3] did not object to the trial court's comment, nor do we find that such a comment, taken in the context in which it was made, rises to the stature of plain error under SDCL 23A–44–15. We do not feel that the com-

---

**3.** Iverson's appellate counsel did not represent    him at trial.

ment denied Iverson a fair and impartial trial.

■ Iverson's fourth question on appeal is whether the officers' execution of the search warrant violated SDCL 23A–35–8, the knock and announce statute.[4] That statute reads, in pertinent part:

The officer executing a search warrant may break open any building, structure, or container or anything therein to execute the warrant if, after giving notice of his authority and purpose, he is refused admittance[.]

Iverson argues that the search, executed while both he and his roommate were absent, violated the statute. Iverson's argument is based on his belief that entry with a pass key may be a forced entry and that under the statute a forced entry may be allowed only when it is the only way to execute a warrant.

In *State v. Steingraber,* 296 N.W.2d 543 (S.D.1980) we examined South Dakota's knock and announce statute and noted the similarity to 18 U.S.C.A. § 3109 and section 844 of the California Penal Code. We quoted with approval the California Supreme Court's summation of the purposes and policies underlying the statute:

"... (1) the protection of the privacy of the individual in his home ... (2) the protection of innocent persons who may also be present on the premises where an arrest is made ... (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice ... and (4) the protection of police who might be injured by a startled and fearful householder...." (citations omitted)

296 N.W.2d at 545.

The dispositive question before us is whether execution of the search warrant when no one was present to admit the officers "frustrated or made nugatory any of the purposes and policies previously enu-

merated." *See Steingraber,* 296 N.W.2d at 546 (*citing People v. Peterson,* 9 Cal.3d 717, 108 Cal.Rptr. 835, 511 P.2d 1187 (1973)). It is clear that the officers' execution of the warrant in this case did not invade the privacy of any individual, the apartment being then unoccupied. For that same reason, the manner in which the warrant was executed did not endanger innocent persons, nor increase the risk of violence to any person on the premises or to the officers. There is no possibility of violence when a key, supplied by an apartment building manager, is used to make an unannounced entry into a temporarily unoccupied apartment. Thus, the purpose and policy behind the knock and announce statute do not require suppression in this case. None of the purposes behind the statute precluded peaceful entry into an unoccupied dwelling.

■ Iverson further argues that the officers in this case had a readily available means to effectively execute the search warrant without breaking into the apartment. He contends that the fact that the officers found his roommate immediately after the search indicates that they could have found her before the search and requested admittance. The demand for admittance and the notice of authority and purpose required by the statute presupposes the presence of a human being in the premises. *People v. Johnson,* 231 N.Y. S.2d 689 (N.Y.Gen.Sess.1962) *aff'd* 19 A.D.2d 946, 245 N.Y.S.2d 311 (1963).

The warrant was executed as soon after issuance as possible. The officers did not wait until the apartment was unoccupied in order to conduct their search in the residents' absence. The fact that the officers located Iverson's roommate after the search does not prove that they knew where she could be found prior to the search. *See State v. Farber,* 314 N.W.2d 365, 367 (Iowa 1982). The Iowa Supreme Court stated in *Farber,* that:

**4.** Again, Iverson appears to frame the issue in the context of a statutory violation rather than a

Fourth Amendment violation.

No court in any reported decision appears to have held that a knock and announce statute incorporating the common law concept will bar a search when no one is present in the premises to be searched. Knock and announce statutes have uniformly been interpreted to allow forced entry when the resident is absent[.]

314 N.W.2d at 368.

■ The South Dakota statute's provision that officers may break open a building to execute a search warrant if, after announcing their authority and purpose, they are denied admission, does not preclude officers executing a search warrant from forcing an entrance without notice and without first demanding admittance when the house is unoccupied at the time. *Farber, supra, citing* 79 C.J.S. *Searches and Seizures* § 83 (1952). It would be an empty gesture for them to attempt to give notice of their authority and purpose when there is no one present to be affected adversely by the only harm the statute is intended to prevent. *See* 314 N.W.2d at 368, *citing* 1 J. Varon, *Searches, Seizures and Immunities* 555 (2d ed. 1974) (footnotes omitted).

Courts in several jurisdictions have rejected the contention that an effort must be made to locate and bring an absent occupant to the premises before entry can be made. *See Payne v. United States,* 508 F.2d 1391 (5th Cir.1975); *United States v. Gervato,* 474 F.2d 40 (3d Cir.1973), *cert. denied,* 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973); *Diamond v. State,* 363 So.2d 109 (Ala.Cr.App.1978); *People v. Peck,* 38 Cal.App.3d 993, 113 Cal.Rptr. 806 (1974); *Kraft v. State,* 19 Md.App. 108, 309 A.2d 643 (1973); *State v. Gutierrez,* 91 N.M. 542, 577 P.2d 440 (1978), overruled in part on other grounds, *State v. Cervantes,* 92 N.M. 643, 593 P.2d 478 (1979); *State v. Wilson,* 41 Ohio App.2d 240, 325 N.E.2d 249 (1974); *Commonwealth v. Harris,* 479 Pa. 343, 388 A.2d 688 (1978).

The reasonableness of a search depends upon the facts of the case. *Lewis v. United States, supra.* The Iowa Supreme Court tests the reasonableness of a search and seizure by determining "whether the thing done, in the sum of its form, scope, nature, incidents and effect, impresses as being fundamentally unfair or unreasonable in the specific situation when the immediate end sought is considered against the private right affected." *State v. Davis,* 228 N.W.2d 67, 70 (Iowa 1975). We do not find the actions of the officers in this case to be unreasonable. The trial court did not err in refusing to suppress the fruits of the search.

Iverson's fifth issue is an assertion that he was entrapped and therefore entitled to acquittal. Entrapment does not go to the charge that Iverson had more than one ounce of marijuana in his possession. Iverson apparently acquired the marijuana that was found in his apartment and the marijuana that he sold to Hammer, before the law enforcement investigation began.

■ This court has defined entrapment as " '[T]he inducement of one to commit a crime not contemplated by him for the mere purpose of instituting criminal proceedings against him.' *State v. Williams,* 1970, 84 S.D. 547, 551, 173 N.W.2d 889, 891." *State v. Nelsen,* 89 S.D. 1, 7, 228 N.W.2d 143, 146 (1975). When undercover informants, such as Hammer, are used the entrapment defense is applicable:

"When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act". *Sorrells v. United States,* 1932, 287 U.S. 435, 445, 53 S.Ct. 210, 214, 77 L.Ed. 413, 418.

*Nelson,* 89 S.D. at 7, 228 N.W.2d at 146–47.

■ This court adopted the United States Supreme Court's *Sorrells* test in *Williams, supra.* The test focuses on the origin of the intent to commit the crime. *Nelson, supra.* The jury must decide whether the defendant was predisposed to commit the crime. *Id.* Where the jury finds the defendant was predisposed to

commit the crime when encouraged to do so, the defense fails because merely affording the defendant an opportunity to commit the offense does not constitute entrapment. A mere offer to purchase by an undercover agent is not entrapment. *Nelson, supra.*

There are two components to the entrapment defense; the defendant must show police inducement to commit the crime and that he was not predisposed to commit the specific criminal act. *Nelson, supra.* An examination of the facts surrounding Iverson's transaction with Hammer indicates that Iverson had a preexisting criminal intent. Iverson was prepared to sell Hammer marijuana within a few hours of Hammer's inquiry. He accepted payment and appeared accustomed to the criminal activity. The one and one-half pounds of marijuana and the scale found in the apartment indicate that Iverson was regularly selling marijuana.

None of the principal inducements which indicate that the criminal intent originated with law enforcement officers can be found in this case. There were no appeals to friendship, sympathy, or a narcotic's need, and no offers of excessive amounts of money.[5] *Id.* Iverson also failed to show that "undue, prolonged or persistent pressure were exerted against him." *Id.*

The use of subterfuge and deception to obtain evidence of a crime, or otherwise furnishing an opportunity for commission of a crime by one ready and willing to commit it, is not entrapment. *State v. Parker,* 263 N.W.2d 679 (S.D.1978). The trial court instructed the jury on entrapment and placed the question before them as required in *Nelson, supra; Parker, supra;* and *State v. Nagel,* 279 N.W.2d 911 (S.D. 1979). The jury apparently found no entrapment. We agree.

As a final issue, Iverson asserts that he was denied the effective assistance of counsel at trial that is guaranteed under the Sixth Amendment to the United States Constitution. In past examinations of assertions that a defendant was denied a fair trial due to ineffective counsel this court has made it clear that attorneys are presumed competent and that parties alleging incompetence have a heavy burden in establishing ineffective assistance of counsel. *State v. McBride,* 296 N.W.2d 551 (S.D. 1980); *Brim v. State,* 290 N.W.2d 680 (S.D. 1980); *State v. Pieschke,* 262 N.W.2d 40 (S.D.1978); *State v. Roth,* 84 S.D. 44, 166 N.W.2d 564 (1969).

This court will not second guess the tactical decisions of trial attorneys nor substitute our own theoretical judgment for that of defense attorneys who have dealt with appellants in an attorney-client relationship. *Grooms v. State,* 320 N.W.2d 149 (S.D.1982). Criminal defendants are entitled to adequate, effective counsel and we have acknowledged that "a mere perfunctory and casual representation does not satisfy the constitutional guaranty to the effective assistance of counsel." *Pieschke,* 262 N.W.2d at 45. The issue is whether defense counsel exercised "the customary skills and diligence that a reasonably competent attorney would exercise under similar circumstance." *State v. Tchida,* 347 N.W.2d 338 (S.D.1984); *State v. Phipps,* 318 N.W.2d 128 (S.D.1982).

Iverson offers four bases for his argument that his trial counsel was ineffective. He contends that (1) counsel failed to have the trial judge disqualified, (2) counsel failed to support his motions to suppress with adequate citations, (3) counsel failed to object when the trial judge commented, "I believe the tape recording was made on 4–15 of '83 and an attempt was made to purchase two ounces of marijuana from Nels Iverson[,]" and (4) counsel failed to call certain witnesses to present Iverson's entrapment defense.

It is apparent from our holdings and the discussion set out above that there was very little legal basis for Iverson's motions to suppress and absolutely no factual basis for an entrapment defense. It is also clear from the discussion above

5. Hammer paid Iverson $80 for two ounces of marijuana.

that counsel's failure to object to the judge's comment did not prejudice Iverson. Considering the context in which it was made and that timely objection would only have emphasized the statement out of context, we do not believe trial counsel's failure to object constitutes ineffective assistance. Finally, the opportunity to disqualify a judge is statutory and not a constitutional right, except as it may be implicit in the right to a fair trial. *State v. Erickson*, 80 S.D. 639, 129 N.W.2d 712 (1964). Iverson had a fair trial.

We affirm the convictions.

All the Justices concur.

FOSHEIM, Chief Justice, WOLLMAN, Justice, and WUEST, Circuit Judge, acting as a Supreme Court Justice, concur.

HENDERSON, Justice, concurs in result.

APPENDIX