RAINEY, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–305–CR. Submitted on briefs October 7, 1976.—*
*Decided November 3, 1976.*
(Also reported in 246 N. W. 2d 529.)

190

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, and *Robert J. Paul,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Betty R. Brown,* assistant attorney general.

CONNOR T. HANSEN, J.

On January 23, 1973, based upon the sworn testimony of an unnamed informant and a Milwaukee police officer, a search warrant was issued for the search of the first floor premises of 1414 W. Vliet street, Milwaukee, for heroin. The business establishment located at that address was known as Tot's Shoeshining. It was comprised of some pool tables, a juke box and a shoeshine stand located on the first floor of the building.

On the same date, Milwaukee police officers executed the search warrant. The search resulted in the seizure of varying amounts of packaged and unpackaged heroin, cocaine, marijuana, other drugs, and numerous items of drug paraphernalia. There was testimony that the drugs seized had a street value of between $18,000 and $20,000. The defendant and Willie Armstrong were arrested on the premises at the time of the search. They were both charged with the same offenses, tried as co-defendants, and convicted of the same offenses.

Prior to the trial, the motion of the defendant to suppress the evidence seized was heard and denied.

Facts which we deem relevant to this review will be set forth as the issues presented are considered. The three issues are:

1. Was the issuance of the search warrant based upon probable cause?

2. Did the actual search extend beyond the scope of the area authorized to be searched?

3. Did the trial court commit such cumulative errors so as to deny the defendant his due process right to a fair trial?

## PROBABLE CAUSE.

On the morning of January 23, 1973, a Milwaukee county assistant district attorney appeared before a Mil-

waukee county judge for the purpose of securing the
issuance of two search warrants; one was for the prem-
ises located at 1414 West Vliet street in Milwaukee,
Wisconsin. In support of the application for this search
warrant, the sworn testimony of two witnesses was pre-
sented. Before the testimony of the first witness was
taken, the assistant district attorney stated that for
reasons to be disclosed, the witness did not wish to reveal
his name on the record unless the court deemed it neces-
sary. The assistant district attorney further stated that
the witness would be willing to reveal his name in cam-
era as long as it would be withheld from the record. The
name of the witness does not appear in the record and
he testified that he did not wish to identify himself on
the record because ". . . the guy would try to get me
wiped out, you know, if he found out, because he knows
me real well. He would get me bumped off, you know,
killed." He further testified that he was not a paid
police informant and was not paid in this instance.

The witness testified that he had been at the premises
at 1414 W. Vliet street about a dozen times in the past.
Although the sign outside of the location read "Holly-
wood Hosiery," the witness knew the establishment by
the name of "Tot's Shoeshining," comprised of a shoe-
shine parlor with pool tables and a juke box, all located
on the first floor.

The witness stated that he had been on the premises
within the last 48 hours and that he had personally ob-
served one Wendall, the man who ran the establishment,
transact a sale of heroin. More specifically, the witness
stated that he had gone to Tot's with another man. The
other man walked up to Wendall and stated, "I want to
cop some dope." The witness testified that in street
terminology, that statement meant that the other man
wanted to purchase "Hard stuff," i.e., heroin, cocaine
or morphine. Wendall asked what kind, and the other

man answered "Boy," which is street terminology for heroin.

The witness testified that the man gave Wendall $25, whereupon Wendall, the man and the witness all walked back to a small room in the rear of the establishment. The witness personally observed Wendall remove a brown manila envelope from behind a board in the back room. The envelope contained about 10 tin foil packets. The witness testified that Wendall removed three of those "dime bags" from the envelope and gave them to the man. The witness observed the man tear open one packet, dip in a corner of a match book cover and "snort" the brown powdered substance.

The witness testified that he had seen Wendall go back and get drugs before but that he had never seen exactly where Wendall had his "stash." The witness testified that he had had heroin before, but that he had never bought any.

The second witness, Officer Dennis Forjan, testified as to the physical layout of the establishment located at 1414 W. Vliet street, and verified the address.

The judge, based upon the testimony presented, found that there was probable cause to issue a search warrant to search the entire first floor premises at 1414 W. Vliet street for heroin, and a search warrant was thereupon issued.

Under these facts, the defendant contends that there was not probable cause shown for the issuance of a search warrant. It is the position of defendant that the sworn testimony of the unnamed informant who testified at the search warrant hearing will not support the issuance of a search warrant because his prior reliability, credibility and truthfulness were not established by specific testimony at the hearing.

Defendant confuses the situation presented by the facts of this case with a situation where a search warrant is

based upon an affidavit of the police which itself is based upon the hearsay statements of an unnamed police informant.

In the recent case of *Scott v. State* (1976), 73 Wis.2d 504, 243 N.W.2d 215, in discussing the situation where a complaint for a search warrant was based upon the information of an unnamed informant, this court stated at page 509:

". . . The information contained in the instant complaint was based on information from an informer. While a search warrant may be validly issued upon hearsay information, hearsay obtained in the manner herein described is subject to verification pursuant to the tests delineated by the high court in *Aguilar v. Texas, supra,* explicated in *United States v. Ventresca* (1965), 380 U.S. 102, 85 Sup. Ct. 741, 13 L. Ed.2d 684; *Spinelli v. United States* (1969), 393 U.S. 410, 89 Sup. Ct. 584, 21 L. Ed.2d 637, and *United States v. Harris* (1971), 403 U.S. 573, 91 Sup. Ct. 2075, 29 L. Ed.2d 723, and applied by this court in cases subsequent thereto."

■ This court has recognized that in such instances, *Aguilar v. Texas* (1964), 378 U.S. 108, 84 Sup. Ct. 1509, 12 L. Ed.2d 723, requires that the officer requesting the search warrant must provide for the magistrate's consideration: (1) The underlying circumstances from which he concludes that the informant is reliable; and (2) information showing that the underlying circumstances or manner in which the informant obtained his information is reliable. *Sanders v. State* (1975), 69 Wis.2d 242, 258, 230 N.W.2d 845; *State v. Mansfield* (1972), 55 Wis.2d 274, 279, 198 N.W.2d 364; *State v. Paszek* (1971), 50 Wis.2d 619, 627, 184 N.W.2d 836.

■■ Both prongs of the *Aguilar* test stated above go to the informant's reliability; the first to his informational reliability or credibility, and the second to his observational reliability. *State v. Knudson* (1971), 51 Wis.2d 270, 274, 187 N.W.2d 321. When the affidavit

for a search warrant is based upon the hearsay statements of an unnamed police informant, it is essential that the magistrate have before him such facts as will enable him to establish independently the twofold reliability of that informant. Even when the informant is a named citizen informant, as opposed to the traditional unnamed police informant, reliability at least as to the second prong must be established. *Allison v. State* (1974), 62 Wis.2d 14, 214 N.W.2d 437.

The underlying purpose of the *Aguilar* criteria is to enable a neutral and detached magistrate to make an independent determination of an informant's reliability when that informant does not appear personally before the magistrate. To do so he must have information over and above the bald statement by the applying officers that the informant is reliable. *Mansfield, supra,* 280. The *Aguilar* criteria supply that information.

The facts of this case do not present an *Aguilar* situation. Unlike the situations in *Aguilar, Scott, Sanders, Paszek,* and the majority of the cases cited by the defendant, in the instant case the unnamed informant personally appeared before the magistrate. This is not a case where the police interceded between the informant and the magistrate. The informant gave sound and adequate reasons for not wanting his name to appear on record and yet at the same time indicated that he would, if the court desired, reveal his name. Under these circumstances, and when the witness appears personally and testifies, the disclosure of this name is not relevant to the issue of probable cause.

The informant was sworn and testified as to events which he personally observed. His familiarity with the establishment located at 1414 W. Vliet street and his familiarity with both Wendall and Wendall's dealings on prior occasions was apparent. His knowledge of street terminology pertaining to drugs and his own familiarity

with drug usage were evident. It was clear that his observation and experience enabled him to recognize a drug sale when he saw one. He was not a paid police informer.

The magistrate was in a position in the instant case to personally observe the informant and to evaluate for himself, first hand, the informant's reliability and credibility, as was his judicial function.

Under such circumstances, this court has held in *Morales v. State* (1969), 44 Wis.2d 96, 170 N.W.2d 684, that the *Aguilar* tests are not applicable; that those inquiries are relevant only when the application for the warrant is based on hearsay information supplied by an unnamed informant and not when the warrant is based upon the sworn testimony of an informant as to facts which he personally observed.

In *Morales, supra,* the defendant's residence was searched pursuant to a search warrant based on the sworn testimony of one Alvarez, a drug addict. The defendant argued that Alvarez was not credible and that the magistrate should have inquired into his credibility and not just accepted his testimony. This court held that no such duty existed, stating at page 103:

". . . Alvarez testified as to facts of which he was personally aware; and the magistrate, having heard such testimony, was justified in accepting it as trustworthy."

Where the magistrate has had the opportunity to personally observe the informant and to personally hear his sworn testimony, and where based upon those observations and that testimony, the magistrate independently determines that the informant is reliable and credible, nothing further in terms of established prior reliability or corroboration along the *Aguilar* lines is necessary. In such a case the magistrate has made his neutral and detached determination.

The defendant would distinguish *Morales* on the grounds that the informant there was named and on the further grounds that the testimony of Alvarez was there corroborated in part by the subsequent testimony of a police officer. The defendant further states that Alvarez was not a heroin user. As to the first point, if the informant personally appears before the magistrate and in sworn testimony gives sound reasons for not revealing his name on the record, the absence of his name on the record is of no relevance to a finding of probable cause. As to the second point, this court in *Morales,* at page 104, found that the testimony of Alvarez alone was enough to support a finding of probable cause and that the subsequent testimony of the police officer was "superfluous." As to the third point, there was absolutely no doubt that Alvarez was a heroin user.

The defendant further reaches the unwarranted conclusions that the testimony of the informant here indicates that he was both a drug addict and a paid police informer. From those conclusions, the defendant argues that he was thus less worthy of belief. Suffice it to say that even if the conclusions drawn were valid the magistrate would still be entitled to believe the informant.

The personal observation of the informant by the magistrate and the sworn testimony of the informant as to his own personal observation of criminal activities provided an adequate basis upon which the magistrate could and did conclude that the informant was truthful, credible and reliable, and that probable cause existed to support the issuance of the search warrant.

## SCOPE OF THE SEARCH.

Based upon the testimony of the informant that: Tot's Shoeshining comprised the first floor of the building at 1414 W. Vliet street; that he observed a drug sale taking

place in a small room in the back of that establishment; that he thought there was an upstairs flat; and upon the testimony of Officer Forjan that the building was two-storied, the judge issued a search warrant directing the search of the ". . . [e]ntire first floor premises of shoe shine parlor formerly known as Hollywood Hosiery at 1414 West Vliet Street" and occupied by "John Doe a/k/a Wendall."

Officer Forjan testified that after the search warrant had been issued on January 23, 1973, he and another officer began a surveillance of the premises at approximately 10 a.m. At approximately 12:15 p.m., they observed the defendant and Armstrong enter the premises after unlocking the door. Approximately one minute later a third man appeared and was admitted by Armstrong. A fourth man appeared shortly thereafter and was admitted by the third man. The third and fourth men were not recognized by Forjan and left shortly after entering the premises. Forjan then called for further assistance and when other officers arrived they forcibly entered the building because the occupants would not admit them.

Upon entering the premises, Forjan testified, he observed Armstrong peering out through one opening in the wall of a balcony room toward the rear of the first floor, and the defendant peering out through another opening. The arrest and search took place in the balcony room, and it is the position of the defendant that the balcony room was not within the scope of the premises described in the seach warrant.

Forjan also testified that immediately upon observing the defendant and Armstrong in the balcony room, he ran up the stairs to it, passing Armstrong who was running down, and confronted the defendant, who was still in the balcony room. He calmed the defendant down, and looked about the room. On the bed he noted a 14 × 21 inch glass plate with brown powder on it; a tea strainer with brown powder on it; a playing card; four measur-

ing spoons; two torn prophylactics; one prophylactic containing a white crystal-like powder; a jar; and a plastic bag with white powder. The powdered substances were later identified as heroin and cocaine.

Forjan further testified that in his knowledge and experience the glass plate was the type commonly used to mix heroin' and cocaine with adulterants in a process known as "cutting"; the playing card and tea strainer were devices commonly used for mixing or "cutting" of the same substances; the spoons commonly used for measuring and the prophylactics commonly used for the transporting of illegal drugs.

After observing the above described substances and paraphernalia, Forjan read the search warrant to the defendant and Armstrong and performed a field test on the brown powdered substance on the glass plate. The field test gave a positive reaction for heroin. The defendant and Armstrong were then placed under arrest.

The search of the balcony room then proceeded and the officers found the heroin, cocaine and marijuana in various places, some unpackaged, and some packaged in a variety of ways. They also found capsules of Demerol, some procaine, quinine, benzocaine, Pentobarbitol and a variety of drug-related paraphernalia. All of the items seized were admitted into evidence and the defendant stipulated to the receipt of the state chemist's report which identified the various substances.

■■■ This court has long held that the purpose of requiring the warrant to particularly describe the property to be searched is to direct the officer to the exact place to be searched and to guard against abuses that prevailed under the old writs of assistance which left the place to be searched to the discretion of the searching officer. *Morales, supra,* 104, 105; *Anderson v. State* (1927), 192 Wis. 352, 356, 212 N.W. 628; *Chruscicki v. Hinrichs* (1928), 197 Wis. 78, 80, 81, 82, 221 N.W. 394.

There is no question that the search warrant here adequately specified the area to be searched as the "Entire first floor." The only question is whether that designation encompassed the balcony room. The defendant contends that the balcony room was an upper bedroom on the second floor. The state contends that the balcony room was part and parcel of the first floor.

The factual dispute was argued at the hearing on the defendant's motion to suppress. The trial court there, in reaching its decision that the balcony room was part of the first floor and hence within the proper scope of the warrant, considered both the testimony of Officer Forjan and photographic exhibits depicting the interior of the establishment.

Officer Forjan's testimony as to the physical layout of the establishment was as follows: The building at 1414 W. Vliet street was a two-story building, approximately 25 feet wide and 50 feet long. It was comprised of one dwelling with two separate quarters, upper and lower. There was a 12 to 15 foot ceiling upon entry at the first floor front door and an extra ceiling in the rear of the room where the balcony room was. Some number of steps less than 10 to 15 led up to the balcony room. The balcony did not have a separate address; it had no direct doors leading to it from the outside; and it was Forjan's recollection that one could not get to the second floor from either the large room or the balcony room. Forjan testified that the police never went above the ceiling that he first described; and never went into the second story or second dwelling.

Based upon the testimony and the photographic evidence, the trial judge made the following findings of fact and conclusions:

"THE COURT: Now, it appears from the pictures that have been presented to the Court that we do have the question of semantics—there is a store building from

the outside, the Hollywood Hosiery sign there, and it appears to be a two-story building.

"Now, the interior of the pool room and the shine parlor indicates that at the rear or apparently to one end of that building there is some kind of a structure, some steps leading up into the thing.

"You have akin here the same problem that the officers would encounter if they searched a split level apartment. There are two stories to the building and there is a compartment on the first floor that would be somewhat of a loft type situation with steps.

"The Court must find, predicated upon these pictures and upon the testimony, that the search of that loft portion was proper and in accord with the requirements set forth, instructions set forth in the warrant issued by Judge Jennaro, and consequently that part of the defendant's motion is also dismissed."

█ While the photographic exhibits are not part of the record on appeal, it is clear from the testimony of Officer Forjan and the findings of the trial judge who heard the motion to suppress, that the scope of the search was proper. The search warrant authorized the search of the ". . . [e]ntire first floor premises." As the evidence shows, the balcony room was part and parcel of the first floor premises. Its entrance and exit were via the first floor door; it had no separate address; and apparently it had no connection to the second floor dwelling. Furthermore, it was below the ceiling which comprised the floor of the second story. Later testimony at trial indicated that it had windows or openings that looked into the shoeshine parlor proper.

█ At the suppression hearing, the trial judge found the balcony room to be encompassed within the term ". . . [e]ntire first floor premises. . ." The defendant presents nothing to indicate to the contrary. Rather, the defendant would limit the extent of the search to the literal first floor. Concealment of evidence or frustration of purpose would certainly result if a search warrant

were to be so limited. *State v. Suits* (1976), 73 Wis.2d 352, 357, 243 N.W.2d 206.

 The obvious purpose of designating the entire first floor premises in the warrant was not to limit the search *literally* to the first floor, but to identify the area to be searched and to distinguish it from the separate second-story dwelling. Any reasonable reading of the warrant indicates that it most certainly authorized the search of a structure or portion which was part and parcel of that first floor premises, as was the balcony room.

Such a conclusion was reached by the federal court in *United States v. Palmisano* (E.D. Wis. 1974), 386 Fed. Supp. 599. There the search warrant authorized the search of "[t]he premises known as 346 North Broadway, Milwaukee, Wisconsin, this being a single story brick structure, housing a front tavern area which contains a bar, pool table, and related equipment, and a back room immediately adjacent to the tavern area."

In holding that the search warrant authorized the search of the basement of the building, the federal court saw the key concept as "premises," stating at p. 599:

"In my opinion a fair reading of this warrant indicates that a search of the entire premises at 346 North Broadway was authorized and was not to be limited to the front and back rooms; specific reference to those areas in the search warrant and in the Hunt affidavit was for the purpose of more fully identifying the premises and was not intended to reduce the area to be searched. . . ."

So too in the instant case, the balcony room was part of the "premises" which comprised Tot's Shoeshining.

 The search conducted was properly within the scope of the warrant. It is irrelevant that the informant never mentioned the existence of the balcony room or that he only observed heroin in the small back room. The fact remains that the balcony room was part of the

first floor premises and that validates the search as far as the issue of scope is concerned.

## CUMULATIVE ERRORS.

The defendant contends that cumulative errors committed by the trial court denied him his due process right to a fair trial.

Specifically, the defendant asserts that: (1) The instructions of the trial judge on the heroin and cocaine count were confusing or misleading to the jury; (2) it was error for the trial judge not to give the missing-witness instruction; (3) the trial court abused its discretion by permitting testimony as to drugs found during the search other than the three drugs specified in the information; and (4) the trial court abused its discretion in permitting continued use of leading questions on the state's direct examination of certain police officers.

We have considered each of these arguments and examined the complete record. After such consideration and examination, we are not persuaded that any of the arguments thus advanced have any significant merit in this case.

No error was committed by the trial court in jury instructions; denial of the request to give the missing-witness instruction; acceptance into evidence of the testimony concerning drugs found but not charged; or rulings on leading questions. There was no cumulative error.

*By the Court.*—Judgment and order affirmed.