STATE of Wisconsin, Plaintiff-Respondent,

v.

Michael Anthony KING, Defendant-Appellant.

Court of Appeals

*No. 2007AP1420–CR. Submitted on briefs April 1, 2008.
—Decided July 22, 2008.*

2008 WI App 129

(Also reported in 758 N.W.2d 131.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Mark S. Rosen* of *Rosen and Holzman*, of Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Anne C. Murphy*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. Michael Anthony King appeals from a corrected judgment of conviction entered after a jury found him guilty of possession with intent to deliver cocaine (more than five grams but less than fifteen grams) and possession of tetrahydrocannabinols (THC), second offense, contrary to Wis. Stat. §§ 961.41(1m)(cm)2., 961.41(3g)(e), and 961.48 (2001–02).[2] King argues that the trial court erred in denying his motion to suppress physical evidence seized during the execution of what he contends was an

---

[2] As amended effective February 1, 2003, by 2001 Wis. Act 109. All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

invalid anticipatory search warrant. In addition, he argues that the trial court erred in failing to give a lesser-included offense jury instruction. Because King has established that the warrant was not a valid anticipatory search warrant and thus, that the evidence seized during the search should have been suppressed, we do not address the latter issue he raises regarding the lesser-included offense instruction. Accordingly, we reverse the judgment and remand the cause for such further proceedings consistent with this opinion as may be appropriate.

## I. BACKGROUND.

¶ 2. The underlying facts are undisputed for purposes of our review. A Milwaukee detective applied for a warrant related to "certain premises located at 8811, 8813, 8815 West Mitchell, West Allis, Wisconsin, more particularly described as a three-unit townhouse . . . ." The warrant stated: "This authorization is contingent upon law enforcement officers identifying the precise unit, 8811, 8813 or 8815, in which Michael King resides. No search of any unit is authorized absent such a

---

The second amended information reflects that King was charged with possession with intent to deliver cocaine (more than five grams but less than fifteen grams), as a party to a crime. The verdict form establishes that the jury found King guilty of possession with intent to deliver cocaine as charged in the information. The judgment roll, however, reflects that the judgment of conviction subsequently was corrected due to an error by the court clerk and that the reference to party to a crime was deleted. The record is unclear as to what prompted the deletion.

We need not resolve the discrepancy to resolve the issues raised. Consequently, for purposes of this opinion only, we omit the party to a crime reference in our discussion of the crimes King was convicted of committing.

verification, and the authorization extends only to that unit in which Michael King resides."

¶ 3. In a forty-two page affidavit supporting the search warrant related to King (and presumably other search warrants), a detective detailed his investigation of a narcotics trafficking organization believed to be led by Samuel Caraballo.[3] The affidavit referenced numerous individuals believed to be involved in the organization, one of whom was King. With respect to the various addresses and locations identified, the detective stated in the affidavit: "Specific information relating to each location is detailed below, however, I submit that the affidavit in its entirety should also be considered for each location, given the connection and contribution of each of these locations and the associated individuals to the continuing operation of the organization as a whole."

¶ 4. The portions of the affidavit directly pertinent to King provided:

**MICHAEL KING**

### 8811/8813/8815 West Mitchell Street, West Allis

* 8811/8813/8815 West Mitchell Street is a three-unit townhouse with reddish brown and light colored brick on the lower, beige siding on the upper, and the numbers "8811", "8813", and "8815" in black numerals on white plates affixed to the entrance door of the unit. West Allis Police Detective Lonnie Averkamp reports that he has spoken to Officer Coolidge assigned to the

---

[3] The affidavit in support of the search warrant was initially ordered sealed by the trial court; however, it was subsequently ordered unsealed when it became apparent that it would be pertinent to this appeal and the reason requiring the sealing of the search warrant no longer existed.

West Allis schools. The officer recently had a truancy case with . . . Michael King's son. [King's son], who resides at Michael King's former address of 856 South 86th Street, then took Officer Coolidge to Michael King's new residence of 8811/8813/8815 West Mitchell Street, West Allis. Officer Coolidge reports that Michael King's blue pickup truck is parked in front of that location. **NOTE: This is a request for an anticipatory search warrant, as the unit in which Michael King resides has not been verified.**

A. On March 16, 2004, at 5:02 P.M., **CARABALLO** receives a call from Michael [K]ing regarding the purchase of "half a thing". King tells **CARABALLO** that he'll meet with **CARABALLO** to conduct the transaction (call #81).

B. On March 20, 2004, at 6:13 P.M., I observed **CARABALLO** meet with King in **CARABALLO**'s vehicle outside of 3135 South 92nd Street, a pizza parlor supposedly owned by King. Afterwards, King exits and walks into the pizza parlor, and **CARABALLO** leaves and is followed. **CARABALLO** is observed on his cell phone at this time, and at 6:24 P.M. he calls [another individual believed to be involved] and tells her that his friend needs the other ones not in the baggies (call #633).

C. On April 3, 2004, at 12:15 P.M., **CARABALLO** calls King, who tells him that he is "moving shit". King also tells him that he has about "fifteen" for him, and that he is bringing a load of "shit" down here and will call **CAR[A]BALLO** in an hour and a half (call #2319).

D. On April 20, 2004, King calls and asks what's up, and **CARABALLO** replies nothing, he's waiting for his guy. King tells him to call him at the shop whenever (call #4359).

(Bold and capitalization in original.)

678

¶ 5. On May 19, 2004, one month after the last phone call between King and Caraballo, the trial court issued a search warrant allowing officers to look for a plethora of items, including the following: cocaine; paraphernalia related to the sale, packaging, or distribution of cocaine; drug-related paraphernalia; photographs, videotapes, utility bills, canceled mail envelopes, bank statements, or other documentation establishing the identity of the individuals in control of the residence; and so on. The search warrant was executed the following day at 8813 West Mitchell Street. The officers found, among other things, approximately 7.7 grams of cocaine, 30.7 grams of marijuana, a digital scale, and $1900 in a pair of men's jeans. King, who was in the residence at the time of the search, was taken into custody.

¶ 6. One of the detectives involved in executing the search warrant testified as to how they came to search 8813 West Mitchell Street:

> [Prosecutor:] And can you just describe to the jury how the search warrant was conducted at the home?
>
> [Detective:] We were briefed prior to getting to the residence, and we were notified by Detective Lonnie Avercamp that the search warrant was anticipatory in nature, that the search warrant – someone was to knock on the door and observe the target, Mr. King, inside the residence. Upon observing Mr. King in the residence, we were then allowed to make entry into the residence and secure the residence.
>
> [Prosecutor:] Can you describe what "anticipatory in nature" means, was there a question about his living arrangement, or how did that work, Detective?
>
> [Detective:] My understanding is that there was information that Mr. King was currently residing at this

679

residence, but there was no direct link; for example, like utilities or such, there was no direct link. We believed he lived at the address, but I don't believe there was any direct evidence.

The prosecutor proceeded to ask the detective for details regarding how the search warrant was executed:

[Prosecutor:] Now, did you, in fact, go to the residence, and how was the search warrant executed, how did that work?

[Detective:] There was a swat team that makes entry. There is a canine officer who knocked on the door of the residence. Shortly after that the residence door was opened, that officer observed Mr. King inside of the residence. Upon observing Mr. King in the residence, he gave the order or told everybody we could enter at that point.

¶ 7. During cross-examination, the detective was asked additional questions pertaining to the search warrant's execution:

[King's attorney:] What were you told about the search warrant?

[Detective:] I was told that it was an anticipatory search warrant, the target was Michael King, the address was 8813 West Mitchell Street in West Allis, and I was told the search warrant had to be executed in the following manner; a law enforcement officer had to knock on the door, we had to determine Mr. King was inside the residence, upon determining that Mr. King was inside the residence we are able to execute the search warrant, take everybody into custody, and then proceed to search the residence.

[King's attorney:] How many units were there in the building that you went to?

680

[Detective:] The building, I believe, is a three-unit, two- or three-unit town house. I think it's three units.

[King's attorney:] And you're telling me that when you went to that building you knew which unit you were going to?

[Detective:] Yes, I did.

. . . .

[King's attorney:] And you're satisfied that the only unit that was ever in issue was 8813 West Mitchell?

[Detective:] Yes, sir.

[King's attorney:] And that is where ultimately you and your cohorts entered the building?

[Detective:] Yes.

¶ 8. Another officer involved in executing the warrant testified that he never saw the actual warrant and that his understanding was also that execution was contingent upon positive identification of King.

¶ 9. The detective who conducted the briefing for the officers who were going to execute the search warrant further testified as to what was discussed during the briefing and his understanding of the nature of the search warrant:

[King's attorney:] . . . Did you brief them on the fact that it was, what is described as, an anticipatory search warrant?

[Detective:] Yes.

[King's attorney:] And what did you tell them the anticipatory nature of the warrant was?

[Detective:] Well, I gave them instructions that we had received from the assistant district attorney, and I relayed those instructions.

[King's attorney:] Those instructions were what?

[Detective:] The instructions were that we had a search warrant for where we believed that Mr. King resided at, 8713 [sic] West Mitchell Street, that we had background from a school liaison officer that he had taken Mr. King's son to that residence at 8713 [sic] West Mitchell Street, that Mr. King's blue pick-up truck was parked at 8713 [sic] West Mitchell Street, and that officers were to attempt to make contact at that address to verify that Mr. King lived at 8713 [sic] West Mitchell Street, and once officers had Mr. King as being at that residence, that fulfilled the requirements of the anticipatory search warrant to be valid.

The detective later conceded that the search warrant referenced 8811, 8813, and 8815 West Mitchell Street, and that his earlier testimony to the effect that the officers knew the specific unit they were going to was not reflected in the search warrant.

¶ 10. King was ultimately charged with the following: conspiracy to commit the offense of delivery of cocaine; possession with intent to deliver cocaine (more than five grams but less than fifteen grams), as a party to a crime; and possession of THC, second offense. He brought a motion to suppress the evidence seized during execution of the search warrant, asserting that the warrant leading to the search was not sufficiently particularized, nor was it supported by probable cause.

¶ 11. The trial court denied King's motion, concluding both that the particularity requirement was met and that probable cause was sufficient. It stated:

In this case, the warrant does set forth the place to be searched and the things to be seized particularly. There are some – There's one item which is stated in the alternative, that is the address, and Judge Sullivan[, who issued the warrant,] was very careful to allow

682

the warrant to be executed only after confirmation of the specific address. And it wasn't merely giving an option in this search warrant to the police to find where Mr. King lived. The only allowable places were the three specific places listed in there, and two had to be eliminated and the third had to be confirmed or else the search warrant could not be executed.

The probable cause is a determination that Judge Sullivan made based on the affidavit, and I cannot find on review of that decision that Judge Sullivan's decision that probable cause was stated that Mr. King would have this contraband in one of those three locations, whichever one was confirmed to be his location, I cannot find that that determination and analysis was wholly unreasonable when it was made by Judge Sullivan.

¶ 12. The trial court went on to note that while it did not take issue with the anticipatory nature of the determination of King's address, it did "struggle" with whether the warrant established that probable cause existed at the time of its issuance, a month after the last phone call directly attributed to King. The trial court said:

The question is whether the affidavit sets forth probable cause that the contraband would be found, obviously not proof beyond a reasonable doubt. And although, Mr. Coffey [King's trial attorney], I do not agree with you that there is a problem with the anticipatory nature of the determination of the address, I do agree with you that there is some struggle in terms of that a struggle [sic] is required, that is, a thorough analysis of the details in the warrant to establish that probable cause exists, that at the time, a month after the latest phone call, that the search warrant would be issued that Mr. King would have the contraband in his location, whichever one of three locations was confirmed.

Notwithstanding the court's apparent concern over the lapse of time since the police intercepted the last phone call suggesting King was involved in the narcotics trafficking organization, it concluded that Judge Sullivan analyzed the issue and that the determination he made was not unreasonable based on the facts set forth in the affidavit.

¶ 13. The matter proceeded to trial, and a jury subsequently found King guilty of possession with intent to deliver cocaine (more than five grams but less than fifteen grams) and possession of tetrahydrocannabinols (THC), second offense. The jury found King not guilty of the charge of conspiracy to deliver cocaine. This appeal follows.

## II. ANALYSIS.

*The anticipatory search warrant was not valid; accordingly, evidence of the search should have been suppressed.*

¶ 14. Following a motion to suppress evidence, we "will uphold a trial court's findings of fact unless they are against the great weight and clear preponderance of the evidence." *State v. Richardson,* 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990). However, the issue of whether a search comports with constitutional requirements is a question of law we review independently. *Id.* at 137–38.

¶ 15. King asserts that the trial court improperly denied his motion to suppress. He argues that the use of an anticipatory warrant was improper under the circumstances where there was no property in transit. In addition, King contends that the warrant violated the constitutional requirement that a specific address be

identified to direct law enforcement as to where to search. We address these arguments in turn.

## A. *Improper Use of an Anticipatory Warrant*

¶ 16. King contends that an anticipatory search warrant is not appropriate here, where its execution is conditioned on verification of his address as opposed to being conditioned on certain evidence of a crime being located at a specified place at some point in the future. The State cites to no case law where an anticipatory search warrant was deemed to be appropriate in an analogous context. Instead, it would have us broadly construe the case law to conclude that so long as an anticipatory search warrant is supported by probable cause "the warrant [is] valid even if the execution of the search warrant was not implicitly or explicitly conditioned on the delivery of contraband."

■

¶ 17. " 'Anticipatory warrants are peculiar to property in transit.' " *State v. Meyer*, 216 Wis. 2d 729, 743, 576 N.W.2d 260 (1998) (citation omitted). Such warrants are " 'based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place.' " *Id.* at 733 n.3 (citation omitted).

¶ 18. There are only three published decisions in this state offering any substantive discussion pertinent to anticipatory search warrants. *See id.*, 216 Wis. 2d 729; *State v. Ruiz*, 213 Wis. 2d 200, 570 N.W.2d 556 (Ct. App. 1997); *State v. Falbo*, 190 Wis. 2d 328, 526 N.W.2d 814 (Ct. App. 1994). In *Meyer*, a detective applied for a warrant, and in her supporting affidavit, she detailed information obtained from a postal inspector regarding an intercepted package believed to contain illegal con-

trolled substances. *Id.*, 216 Wis. 2d at 736, 743–44. The detective stated in the affidavit that she believed that there would be evidence of a crime on the premises where the package was to have been shipped. *Id.* at 744. A search warrant was issued. *Id.* at 737. After the detective delivered the intercepted package to the defendant, the warrant was executed, and the officers found marijuana and other drug-related paraphernalia. *Id.*

¶ 19. The defendant in *Meyer* argued that the warrant was unconstitutional because it was not supported by probable cause and lacked conditional language limiting execution until after delivery of the contraband occurred. *Id.* at 741. Our supreme court disagreed, concluding that the warrant was not required to contain conditional language in order to be valid. *Id.* at 744–46. All that was required was that it be supported by probable cause, *see id.* at 745, and in *Meyer*, the court determined "that there were sufficient facts provided to the court commissioner to establish probable cause to believe that controlled substances were on a 'sure course' to the premises and would be present at [the premises] at the time the warrant was executed," *id.* at 744 (citation omitted).

¶ 20. In *Ruiz*, the investigator who applied for the warrant stated in his affidavit that he had made arrangements with UPS to deliver a package, which had been intercepted and determined to contain marijuana. *Id.*, 213 Wis. 2d at 202. The defendant argued, among other things, that the evidence obtained from his home should have been suppressed because the anticipatory search warrant was insufficient due to its lack of a clear statement reflecting that officers were to delay executing the warrant until after the contraband was delivered. *Id.* at 205–06. We disagreed, and upheld the

anticipatory search warrant after concluding that its language "clearly implie[d] that the search was not to commence until the marijuana was delivered." *Id.* at 207.

¶ 21. In *Falbo*, an informant contacted a police officer and provided a description and address for a man who was selling cocaine from his residence. *Id.*, 190 Wis. 2d at 331–32. The man was later identified as the defendant. *Id.* at 332. The informant told the police officer he had accompanied another man, Creasy, to the defendant's home and waited outside while Creasy obtained cocaine from the defendant. *Id.* According to the informant, Creasy made weekly trips to the defendant's residence to purchase cocaine. *Id.* The informant described Creasy's vehicle and the approximate time he went to the defendant's residence each week. *Id.*

¶ 22. After independently confirming the identifying information provided by the informant, the officer sought an anticipatory search warrant. *Id.* Execution of the warrant was conditioned upon the following: the officer arranging surveillance at the defendant's house between specified hours; a vehicle and man matching the description provided by the informant arriving at the defendant's residence with the man entering the residence or making contact with a white male in the residence, at which time the officer would arrange for the vehicle to be stopped; if, upon stopping the vehicle, the man was identified as Creasy, the police would search the vehicle and occupants for cocaine; if cocaine was found, the police officer could then conclude that additional cocaine and related paraphernalia would be located at the defendant's residence. *Id.* at 333. The warrant was executed in accordance with the specified

conditions, and the officers found cocaine and THC at the defendant's residence. *Id.*

¶ 23. The factual circumstances presented in *Falbo* differed from those in cases where contraband was in transit *to* a known residence or person; instead, execution of the warrant was conditioned upon the police finding Creasy in possession of narcotics after leaving the defendant's residence. Despite this distinction, the court held that probable cause was nevertheless established by showing the cocaine would be at the defendant's residence on the date specified in the warrant because that was when Creasy would make his purchase. *Id.* at 336.

■

¶ 24. Each of the above-referenced cases presents circumstances that are markedly different from those at issue here. In the absence of any legal authority directing us to do so, we refrain from extending the use of anticipatory search warrants to encompass situations such as this, where execution is conditioned on verification of an individual's address.

*B. Particularity*

■

¶ 25. Even if we were to conclude that an anticipatory search warrant could be used in this situation, we would nonetheless find the warrant invalid for its lack of particularity, which also independently justifies reversal. The Fourth Amendment clearly sets forth the particularity requirement that must be satisfied prior to issuance of a warrant.[4] It provides:

---

[4] "The Fourth Amendment to the U.S. Constitution is applied to the states through the Fourteenth Amendment to the U.S. Constitution." *State v. Tye*, 2001 WI 124, ¶ 2 n.2, 248 Wis. 2d 530, 636 N.W.2d 473.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The particularity requirement is necessary "to direct the officer to *the exact place to be searched* and to guard against abuses that prevailed under the old writs of assistance which left the place to be searched to the discretion of the searching officer." *Rainey v. State*, 74 Wis. 2d 189, 202, 246 N.W.2d 529 (1976) (emphasis added).

¶ 26. Although addressing Fourth Amendment principles in the context of a John Doe subpoena, the Wisconsin Supreme Court in *Custodian of Records for the Legislative Technology Services Bureau v. State*, 2004 WI 65, 272 Wis. 2d 208, 680 N.W.2d 792, *modified by* 2004 WI 149, 277 Wis. 2d 75, 689 N.W.2d 908 (per curiam), provided useful background information on the dangers that were associated with writs of assistance:

> At the time the Fourth Amendment was being drafted, searches were based on warrants as a matter of course. *See Boyd v.* United States, 116 U.S. 616, 625–27 (1886). The chief evil the founding fathers sought to eliminate with this amendment was a search based on

The language in article I, section 11 of the Wisconsin Constitution is virtually the same and provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

a general warrant, sometimes known as a writ of assistance. *Id.* at 625. These early warrants lacked specificity and allowed government officers in the late eighteenth century to enter homes, shops, and other places, and in the event the officers encountered resistance, they could break down doors and forcibly search closed trunks and chests. *Id.* (calling writs of assistance, "the worst instrument of arbitrary power" since such writs place "the liberty of every man in the hands of every petty officer") (internal quotations omitted).

*Custodian of Records*, 272 Wis. 2d 208, ¶ 36 (footnote omitted).

█

¶ 27. We agree with King that the search warrant afforded law enforcement the sole discretion to search any one of the three addresses specified, in violation of the particularity requirement. There were no safeguards in the warrant as to how the police were going to determine the address. It provided only: "This authorization is contingent upon law enforcement officers identifying the precise unit, 8811, 8813 or 8815, in which Michael King resides. No search of any unit is authorized absent such a verification, and the authorization extends only to that unit in which Michael King resides."

¶ 28. Although the law enforcement personnel who testified at King's trial regarding the search warrant's execution stated that they knew ahead of time that they would be going to 8813 West Mitchell Street and that that residence was the only one involved, this is not reflected in the language of the search warrant, which referenced 8811, 8813, and 8815 West Mitchell Street. Furthermore, the trial testimony of law enforcement personnel regarding what they understood about the nature of the warrant they were executing is

at odds with what the warrant actually specified and reflects the inherent dangers associated with warrants such as the one at issue. Here, two individuals involved in executing the warrant testified that execution was contingent upon observation of King, when in actuality the language of the warrant mandated that it was contingent on verification of King's address.[5] If King had been observed in one of the neighboring units referenced in the warrant, it appears the officers would have searched that residence instead of 8813 West Mitchell Street. This evidences the lack of specificity that the Fourth Amendment was designed to protect against. *See id.*

¶ 29. In addition, we are not persuaded by the State's response to King's argument regarding law enforcement's failure to *first* identify his address and *then* obtain a warrant, which is as follows: "The affidavit, however, clearly shows the complexity of this investigation and the number of individuals involved in this narcotics ring and associated with Carab[a]llo." This is not a valid excuse for law enforcement to avoid undertaking the proper legwork required in order to particularly describe the place to be searched.[6] *Cf. State v. Petrone*, 161 Wis. 2d 530, 541 n.5, 468 N.W.2d 676 (1991) (noting that ambiguity in a warrant will be allowed for " 'when the police have done the best that could be expected under the circumstances, by acquir-

---

[5] Moreover, at least one of the officers involved in executing the warrant testified that he did not even see the warrant prior to execution.

[6] The affidavit reveals that anticipatory search warrants were requested for two other individuals, in addition to King. With respect to the other two individuals, the affidavit provided addresses but went on to state that it was unknown in which unit the targeted individual resided.

ing all the descriptive facts which reasonable investigation of this type of crime could be expected to uncover and by ensuring that all of those facts were included in the warrant' " (citation omitted)).

¶ 30. No information has been provided to explain why King's address could not have been verified before the search warrant was sought. From our review of other cases dealing with search warrants, law enforcement has frequently confirmed the address of a target by checking motor vehicle registration and utility records. Here, other than referencing that a police officer assigned to the West Allis schools saw King's truck parked in front of 8811/8813/8815 West Mitchell Street when the officer was handling a truancy case with King's son, the affidavit does not provide any information as to what investigation was undertaken by law enforcement ahead of time to determine King's address. Presumably no utility billing, property tax records, driver's license, vehicle registration, or other similar avenues were pursued to make this determination before the warrant was sought. Likewise, it is unclear why law enforcement was unable to resolve which of the three addresses stated in the warrant belonged to King.

¶ 31. Were we to conclude that this language was sufficiently particular, we would encourage a crop of search warrants containing alternate addresses, leaving law enforcement free to pick the residence they want to search. On the basis of this record, it would appear sheer luck allowed law enforcement to choose to search 8813 West Mitchell Street. Wisconsin's constitution and the federal constitution require more than luck. We cannot conclude that the language in the search warrant referencing three separate residences complied with Fourth Amendment and article I, section 11 of Wisconsin's constitution.

¶ 32. Based on the foregoing, we agree with King that the warrant was invalid.[7] Because our conclusion

<hr>

[7] King also challenges the validity of the search warrant because the latest supporting fact directly implicating him was thirty days old. In essence, he contends that probable cause was stale such that no inference could be drawn that the items sought would be located in his home at the time of the warrant's issuance.

As noted, " 'Anticipatory warrants are peculiar to property in transit.' " *State v. Meyer*, 216 Wis. 2d 729, 743, 576 N.W.2d 260 (1998) (citation omitted). Notwithstanding this distinction, they must be supported by probable cause just like any other search warrant. *State v. Falbo*, 190 Wis. 2d 328, 336, 526 N.W.2d 814 (Ct. App. 1994) ("[A] probable cause determination in an anticipatory search warrant is the same as the probable cause determination in a conventional search warrant."). Specifically, "[a]n anticipatory warrant is 'a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place.' " *Meyer*, 216 Wis. 2d at 733 n.3 (citation omitted).

From our review of the record, it would appear that probable cause as to the search of King's residence was stale. The most recent information directly tied to King was thirty days old. To minimize the effect of this delay, the State pointed out that the affidavit in support of the warrant referred to over thirty individuals involved in the narcotics ring and detailed intercepted phone calls between Caraballo and other individuals, which took place within five days of when the warrant was issued. Details of the calls that took place within five days of the warrant's issuance, however, make no mention of King. While we acknowledge that the " 'totality of the circumstances' " are to be considered, *see Falbo*, 190 Wis. 2d at 337 (citation omitted), there is nothing in the affidavit to support the combining of the older information pertinent to King with the newer information, in order to establish probable cause as of the date of the warrant's issuance, *cf. State v. Moley*, 171 Wis. 2d 207, 213–14, 490 N.W.2d 764 (Ct. App. 1992) (concluding that a 1990 tip received by a detective, which was old information, combined

on this issue is dispositive in that the evidence seized during the warrant's execution should have been suppressed, we do not address the additional issue King raises pertaining to whether the trial court erred when it refused to give a lesser-included offense instruction to the jury. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds."). Accordingly, we reverse and remand for further proceedings consistent with this opinion as may be appropriate.[8]

with an aerial identification of marijuana plants the following year, i.e., new data, supported the inference that marijuana was growing on the property during the 1991 growing season and established "present probable cause").

For a warrant to have been properly issued for Kings residence, more than mere suspicion was required to establish probable cause. *See State v. Kiper*, 193 Wis. 2d 69, 81, 532 N.W.2d 698 (1995). Although the affidavit details various items that narcotics traffickers commonly keep in their residence, it offers no explanation as to why, despite the lapse of thirty days from the last information directly linking King to Caraballo and despite the fact that law enforcement had not verified Kings address, evidence of criminal activity would nevertheless be present there. We cannot conclude that " 'a practical, commonsense decision' " would have led to the conclusion that probable cause was sufficient as to King's as-yet-to-be-verified residence. *See State v. Ward*, 2000 WI 3, ¶ 23, 231 Wis. 2d 723, 604 N.W.2d 517 (citation omitted). Thus, the lack of probable cause is yet another basis on which the warrant could have been invalidated.

[8] The State does not argue that the good faith exception to the rule excluding evidence obtained in violation of article I, section 11 of Wisconsin's constitution and the Fourth Amendment is applicable here. *See State v. Eason*, 2001 WI 98, ¶ 74, 245 Wis. 2d 206, 629 N.W.2d 625 (holding "that where police officers act in objectively reasonable reliance upon the warrant, which had been issued by a detached and neutral magistrate, a good faith exception to the exclusionary rule applies"). There-

*By the Court.*—Judgment reversed and cause remanded.

¶ 33. FINE, J. (*dissenting*). I respectfully dissent because in my view the Majority ignores both the deference to which we owe the warrant-issuing magistrate, *see State v. Sloan*, 2007 WI App 146, ¶ 8, 303 Wis. 2d 438, 446, 736 N.W.2d 189, 193, and also the common-sense standard we must apply in assessing on appeal a warrant's validity, *see Illinois v. Gates*, 462 U.S. 213, 230–231, 238, 240 (1983) (We must consider the "totality of the circumstances" as revealed by the affidavit and the "reasonable inferences" that permit the issuing magistrate "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). I address briefly the three legs of the Majority's stool.

A. *Alleged Staleness.*[1]

¶ 34. The extensive affidavit in support of the search warrant issued in this case was designed to gather evidence of a large, continuing drug-delivery conspiracy. Drug conspiracies are not Mayflies, popping the surface of law-enforcement awareness and dying in

fore, we consider the issue abandoned and will not address it here. *See State v. Ledger*, 175 Wis. 2d 116, 135, 499 N.W.2d 198 (Ct. App. 1993) (noting that issues not briefed or argued are deemed abandoned).

[1] King argued that the warrant was "stale." The Majority relegates its agreement with King to a footnote as another reason why it reverses. In my view, King's "staleness" argument presents a significant issue and I discuss it here because it also provides context to what I see as the propriety of the warrant in this case, as I further discuss in subpart "B & C."

a day; they last until law enforcement shuts them down. Thus, common sense tells us that drug conspiracies require application of "staleness" principles that might not apply under other circumstances. *See United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008) (In light of a "suggested . . . ongoing drug conspiracy," information in support of search warrant that was collected over several months was not stale.); *United States v. Reyes*, 798 F.2d 380, 382 (10th Cir. 1986) (In light of alleged on-going conspiracy, five-month lapse did not make information in support of warrant "impermissibly stale."). *United States v. Smith*, 266 F.3d 902, 904–905 (8th Cir. 2001) (three-month lapse), states the universally accepted rule:

> There is no fixed formula for determining when information has become stale. The timeliness of the information supplied in an affidavit depends on the circumstances of the case, including the nature of the crime under investigation. "In investigations of ongoing narcotic operations, 'intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale.'"

(Citations and quoted source omitted.) The Majority makes new law by ignoring this common-sense reality.

¶ 35. Further, the information given to the magistrate was *not* stale. As the State points out, the affidavit in support of the search warrant references "other intercepted phone calls within 5 days of the issuance of the search warrant." This indicated that the drug-delivery conspiracy in which King was alleged to be involved was ongoing, and the magistrate could reasonably conclude that the conspiracy was contemporaneous with the issuance of the search warrant. Thus, as part of the alleged conspiracy, the more recent phone-intercepts count in assessing probable cause to

search King's residence. Cf. Wis. Stat. Rule 908.01(4)(b)5 ("A statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is an "admission" chargeable to other parties to the conspiracy and is thus not hearsay as to them.).

### B. & C. *Anticipatory Warrant and Particularity.*

¶ 36. Although the Majority separates the warrant's listing of a three-unit townhouse under both whether the warrant was sufficiently particular and also whether the anticipatory restriction was valid, the two matters are, in my view, on the same side of the same coin. Thus, I discuss them together.

¶ 37. According to the lengthy affidavit in support of the search warrant, the three-unit townhouse had the address of "8811, 8813, 8815 West Mitchell, West Allis, Wisconsin." As the Majority recounts, however, the affidavit indicated that King lived in but one of the units. Thus, in order to protect the occupants of the other units, the warrant was issued only for the unit occupied by King, and the officers were to knock (which, of course, they are permitted to do) to see who might answer the door. If King answered the door, then the warrant's permission to search that unit would kick-in. I am puzzled by the Majority's condemnation of this protection for the occupants of the other units, and its ruling that the officers should have done more to narrow-down the specific address of King's unit. In my view, this imposes unnecessary hurdles; the warrant was issued *only* for King's unit, once they lawfully (by knocking) ascertained it. If no one answered the door, or King could not be seen from outside the door's threshold, the warrant did not authorize the officers'

697

entry and search (unless the person opening the door allowed the officers to come in and they saw King once they were inside).

¶ 38. In essence, I believe that the Majority and the parties misstate the issue by focusing on the concept of "anticipatory warrant," which, as the Majority correctly notes, generally accommodates the need to interdict contraband that may be in transit. This appeal, as I see it however, merely deals with a warrant that authorizes law enforcement to enter one of three connected residences once law enforcement ascertained the one in which King lived.

¶ 39. In my view, the Majority has crimped the law. I would affirm and, accordingly, I respectfully dissent.